IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

TAMMY SIMPSON, Individually and
MARVIN CHARLEY, Individually, Husband and Wife,
And TAMMY SIMPSON, as Guardian and Next
Friend of P.S. and B.C., Minor children,

    Plaintiffs,

vs.                                                                              No.

THE UNITED STATES OF AMERICA;
SARA MICHAELS, M.D.; BRANDON ANDERSON;
THOMAS BURNISON, M.D.; DONALD BRUNK, M.D.;
MARGARET THOMA, M.D.; FARAZ SANDHU, M.D.;
STEVE YOUNG, M.D.; SAN JUAN ONCOLOGY
ASSOCIATES P.C. and its agents JEFFREY
NEIDHART, M.D. and JAMES NEIDHART, M.D.;
BLACK AND WHITE CORPORATIONS
1-10; JOHN AND JANE DOES 1-10,

    Defendants.

**COMPLAINT FOR MEDICAL NEGLIGENCE**
**[Arising under the Federal Tort Claims Act and New Mexico Law]**

Plaintiffs, by and through their undersigned attorneys, and for their complaint against Defendants, state and allege:

**I.    PARTIES**

1. This is a medical negligence action pursuant to the Federal Tort Claims Act, 28 U.S.C. §2671, *et. seq.* (hereinafter the "FTCA") and New Mexico medical negligence law resulting in the permanent injures to Tammy Simpson, to the consortium of Plaintiffs Tammy Simpson and Marvin Charley, and to the consortium of the minors, P.S. and B.C. Plaintiffs' claim that, at all times material, the negligence complained of herein occurred at the Northern Navajo Medical Center [hereinafter "NNMC"], operated by the United States of America through the Department

of Health and Human Services, as an Indian Health Services medical facility located in Shiprock, New Mexico.  Plaintiffs further claim that the negligence of the identified below defendant medical personnel additionally committed negligent acts and failures to act proximately causing Plaintiffs' injuries and damages.

2. Plaintiffs are enrolled members of the Navajo Nation, a federally recognized tribe of Indians, and are residents of San Juan County, State of New Mexico.

3. Plaintiffs Tammy Simpson and Marvin Charley are husband and wife. Plaintiff Tammy Simpson is the next friend of P.S., a minor, and B.C., a minor.

4. Defendant UNITED STATES OF AMERICA ["United States"], through its agents, employees, and through the Department of Health & Human Services, Public Health Service, and Indian Health Service, all federal agencies, at all times hereinafter mentioned, did and now does operate a hospital entitled the Norther Navajo Medical Center in Shiprock, New Mexico, where the claims of negligence in this action arose.  The United States employed medical professionals at the NNMC for medical care and treatment of Navajo patients.  The United States is vicariously liable for the acts and omissions of its physicians, agents, medical personnel, contract medical personnel, and any other capacity persons who were employees and/or agents, performing medical services, including but not limited to: Sara Michaels, MD (family practice); Thomas Burnison, MD (emergency medicine); Donald Brunk, MD (family medicine); Margaret E. Thoma, MD (emergency medicine); Faraz Sandhu, M.D. (cardiologist); Steve Young, M.D. (emergency medicine) and  San Juan Oncology Associates P.C. and James Neidhart, M.D. and/or Jeffrey Neidhart M.D.

5. Defendants SARA MICHAELS, M.D.; THOMAS BURNISON, M.D.; DONALD BRUNK, M.D.; MARGARET THOMA, M.D.; FARAZ SANDHU, M.D. and STEVE YOUNG,

M.D., and SAN JUAN ONCOLOGY ASSOCIATES P.C., JAMES NEIDHART, M.D. (hematologist) and/or JEFFREY NEIDHART, M.D. (hematologist) ["State Defendants"] at all times material, were medical providers who were either federal employees for purposes of invoking the Federal Tort Claims Act or, alternatively, contractors, employees, or actual, implied or ostensible agents of the Defendant United States and are being named in their individual capacities for state supplemental claims arising under New Mexico law, pursuant to 28 U.S.C. 1367(a). These defendant medical personnel are claimed to have committed negligent acts and/or failures to act under New Mexico law which proximately caused Plaintiffs' injuries and damages. The claims against these State Defendants are timely inasmuch as these actions are within the three (3) year New Mexico statute of limitations.

6. The claims for which Plaintiffs sue herein arose from the acts and omissions of Defendants as alleged herein all occurred within the State of New Mexico.

7. If the Defendant United States was a private person, it would be liable to Plaintiffs in accordance with the laws of the State of New Mexico, including the New Mexico Medical Malpractice Act ["MMA"], §§ 41-5-1 et seq., NMSA 1992. All the other defendants are similarly subject to New Mexico law.

8. On July 24, 2017, within two years of the date of claims set forth herein which are subject to the FTCA, the administrative claims were presented to the United States Department of Health and Human Services, Public Health Service/Indian Health Service, pursuant to 28 U.S.C. §2675(a). Said agencies have issued its final disposition of Plaintiffs' claims denying same on July 11, 2018. Plaintiffs have timely filed their complaint within the six months of the denial as provided by the FTCA. 28 U.S.C. §2401 (b).

9. To serve the predominately Native American population of Northern Arizona and Western New Mexico, the United States Public Health Service/Indian Health Service (hereinafter "PHS/IHS") operates and maintains the NNMC where medical services are provided to qualifying members of the Native American community.

10. Upon information and belief, at all times pertinent hereto, Defendant San Juan Oncology Associates P.C. was a domestic, for-profit professional corporation incorporated in New Mexico with a principal place of business at 735 W. Animas Street in Farmington New Mexico 87401; further, Jeffrey Neidhart MD is an employee, Director and President of San Juan Oncology Associates P.C. Upon information and belief, James Neidhart MD is and/or was also an employee of San Juan Oncology Associates P.C.

11. Defendants BLACK AND WHITE CORPORATIONS 1-10, JOHN AND JANE DOES 1-10, are currently unknown entitles, persons, other capacity potential defendants who may have committed negligent acts and/or failures to act which proximately caused Plaintiffs' injuries and damages. Plaintiff will timely amend the complaint to identify such defendants, or dismiss these defendants if the evidence supports such decision.

## II. JURISDICTION

12. Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 11 as though fully recited herein.

13. This is an action against the Defendant United States pursuant to the Federal Tort Claims Act, 28 U.S.C. §2671, *et. seq.* (hereinafter the "FTCA") for medical negligence resulting in Plaintiffs' damages. This court has original and exclusive jurisdiction over the Defendant United States. This Court has jurisdiction over the parties and subject matter hereto pursuant to 28 U.S.C. §1346(b) and the amount in controversy, excluding costs, attorney fees, or punitive damages, exceeds $75,000.00.

14. This Court has additional jurisdiction over the parties and subject matter jurisdiction pursuant to 28 USC § 1346(b) and 28 USC §1367(a). If the Defendant UNITED STATES OF AMERICA was a private person it would be liable to the Plaintiffs in accordance with the laws of the State of New Mexico. All the other named State Defendants and known defendants, and those yet to be identified, are subject to this Court's personal and subject matter jurisdiction pursuant to the Court's ability to exercise supplemental jurisdiction arising under 28 USC §1367(a).

15. This Court will have jurisdiction over State Defendants San Juan Oncology Associates P.C. and its employees or agents James Neidhart MD and/or Jeffrey Neidhart MD as soon as administrative remedies before the New Mexico Medical Review Commission are conclusively met. See §§ 41-5-1 et seq., NMSA 1992 (N.M. Medical Malpractice Act).

### III. FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

16. Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 15 as though fully recited herein.

17. On September 5, 2006, Mrs. Simpson sustained multiple leg fractures in a motor vehicle accident and was prescribed prophylactic Lovenox for one month.

18. On January 5, 2007, Mrs. Simpson was admitted to Northern Navajo Medical Center (NNMC) with bilateral pulmonary emboli, and was placed on Coumadin anti-coagulation therapy for six months, to be managed by NNMC outpatient Coumadin clinic.

19. Mrs. Simpson was seen on April 9, 2009 for an intra-uterine pregnancy. Less than 2 weeks later, she suffered a miscarriage while on Coumadin.

20. On April 27, 2009, she was seen again for a pulmonary embolus and was again placed on Coumadin and followed in the Coumadin clinic.

21. On June 17, 2009 the Coumadin clinic noted a plan to stop Mrs. Simpson's Coumadin on October 27, 2009.

22. On July 2, 2009, Mrs. Simpson's anti-coagulation therapy was switched from Coumadin to Lovenox as she was possibly pregnant and wanted to conceive.

23. On July 22, 2009, NNMC physician Kathleen Wilder, MD changed Mrs. Simpson back to Coumadin based on a phone consultation with a hematologist at the University of New Mexico Health Sciences Center (UNMHSC) who recommended that she complete 6 months of Coumadin therapy before attempting to become pregnant again.

24. On August 13, 2009, Mrs. Simpson again was pregnant and was switched back to Lovenox.

25. On October 16, 2009, Mrs. Simpson was put back on Coumadin after she miscarried her pregnancy.

26. Mrs. Simpson remained on Coumadin for 6 months until February 2, 2010.

27. On February 10, 2010, NNMC provider Donald A. Brunk, MD, discontinued all anti-coagulation therapy because Mrs. Simpson expressed a desire to conceive again. Notably, Dr. Brunk did not re-start Mrs. Simpson on Lovenox.

28. In November 2010, Mrs. Simpson's primary care physician Sara Michaels, MD noted that Mrs. Simpson was pregnant again and planned to consult with perinatology.

29. Following the perinatology consultation Dr. Michaels prescribed Ms. Simpson with Lovenox 40mg subcutaneous per day for anti-coagulation during pregnancy. On November 14, 2010, Mrs. Simpson's anticoagulant blood panel done at NNMC reported a low Protein C antigen at 58% (normal range 70-140). Other values tested at that time were within normal limits

30. No action was taken by any NNMC provider in response to the abnormal Protein C antigen test, even though Mrs. Simpson had been diagnosed with "hypercoagulable state" on November 10, 2010.

31. On November 26, 2010, Mrs. Simpson suffered a miscarriage and her Lovenox was stopped. John Balintona MD, an obstetrician, noted that "will need to discuss optimization of anticoagulation prior to next pregnancy."

32. On February 1, 2011, Dr. Michaels evaluated Mrs. Simpson for paresthesia of the left upper extremity, prescribed aspirin (ASA) and referred her for a consultation with UNM neurology.

33. On April 8, 2011 Mrs. Simpson was re-started on Lovenox again because she was pregnant.

34. On October 28, 2011, at 32 weeks gestation, NNMC physicians started Ms. Simpson on a heparin bridge in addition to taking Lovenox.

35. Mrs. Simpson delivered her baby on November 6, 2011.

36. At her postpartum visit on December 20, 2011, Amber Payne, PA, discontinued Lovenox after a discussion with Dr. Michaels.

37. On August 8, 2015, Mrs. Simpson was admitted to San Juan Regional Medical Center ("SJRMC") for right leg DVT and right lung pulmonary emboli, and she was re-started on Lovenox and Coumadin.

38. While in the hospital at SJRMC, providers Jennifer Manganello, NP and Faraz Sandhu MD recommended that "she will need to continue with lifelong anti-coagulation and likely should undergo hypercoagulable workup with her PCP if not while in the hospital." She was discharged from SJRMC on anti-coagulant Eliquis.

39. On September 10, 2015 NNMC provider Sara Michaels MD advised Ms. Simpson to change back to Coumadin after she finished her Eliquis prescription.

40. On November 4, 2015, the NNMC Coumadin clinic noted that Mrs. Simpson's right leg had been swollen, painful and warm since October 31, 2015, and Keith Warshany Pharm D. consulted NNMC emergency department physician Margaret Thoma MD who was quoted as saying "possible consideration should include Lovenox therapy in addition to Coumadin while patient is symptomatic or placement of a IVC filter."

41. On March 4, 2016, the NNMC Coumadin clinic noted that the duration of Mrs. Simpson's anti-coagulation therapy was 6 months and should be completed by April 15, 2016.

42. On April 13, 2016, the NNMC Coumadin clinic noted the duration of Mrs. Simpson's therapy as "Life/chronic/recurrent," noted the date of her last referral to the Clinic as 9/10/15, noted that per discussion with Dr. Michaels, the patient should schedule one more Coumadin appointment, and noted that Michaels "will talk to Dr. Neiderhart [*sic*] in hematology for recommendation for lifetime warfarin versus IVF filter."

43. Upon information and belief, "Neiderhart in hematology" is properly identified as San Juan Oncology Associates P.C. physician James Neidhart MD or Jeffrey Neidhart MD.

44. On April 21, 2016 Dr. Michaels noted that she had consulted with Dr. Neidhart and that he had recommended two options since the patient's DVT/ PE had been provoked and since her previous hypercoagulable evaluation was negative: (1) lifelong Coumadin given number of events; (2) aggressive prophylaxis when any risk of clot.

45. Dr. Michaels' April 21, 2016 note also states that Dr. Neidhart recommended to check an ultrasound of the legs after treatment, and to check d-dimer and beta 2 glycoprotein if it had not been checked in the past.

46. It is not clear if Dr. Neidhart was made aware of the 2010 Protein C deficiency.

47. On May 18, 2016 after the consultation with Dr. Neidhart, Dr. Michaels advised Brandon Anderson, NNMC PharmD, that "p[atien]t does not need to continue warfarin at this time. P[atien]t to receive prophylactic warfarin when traveling long distances or has high risk behavior for blood clots."

48. The NNMC Coumadin Clinic notes that Mrs. Simpson "graduated from clinic" on May 18, 2016.

49. On September 12, 2016, Mrs. Simpson was diagnosed by the San Juan Regional Medical Center ("SJRMC") emergency room with a superficial thrombus of her left arm.

50. On September 14, 2016, Mrs. Simpson presented to the NNMC Emergency Room with shortness of breath and a sonogram of her left upper extremity revealed "thrombophlebitis within the cephalic vein."

51. NNMC ER physician Thomas Burnison MD contacted the anticoagulation clinic and noted he was advised by 'Keith' that "I couldn't do a referral from the ED--it would have to come from Dr. Michaels."

52. Before discharging Mrs. Simpson from the NNMC ER on September 14, 2016 Dr. Burnison followed Keith's recommendation to prescribe her Warfarin 6 mg po qd with a Lovenox bridge until she reached therapeutic anticoagulation blood levels.

53. On September 17, 2016 at 6:36 pm, Mrs. Simpson was taken to the SJRMC ER and diagnosed with a right middle cerebral artery (MCA) territory ischemic stroke. Since she was already on Lovenox and Coumadin, care providers noted that she was not a good candidate for tPA so she was admitted for supportive medical management of her stroke.

54. During Mrs. Simpson's September 17, 2016 SJRMC hospital admission for ischemic stroke, neurology consultant Laura Waymire, MD noted that Mrs. Simpson suffered the stroke after being taken off her Coumadin on May 18, 2016 by Dr. Michaels.

55. Further laboratory blood done during Mrs. Simpson's September 17, 2016 SJRMC hospital admission for stroke confirmed that she had Protein C and Protein S abnormalities (9/19/2016 labs), and she was diagnosed with a hypercoagulable blood condition and advised that she needed anti-coagulation therapy for life.

56. Plaintiff Tammy Simpson has experienced damages resulting from Defendants' conduct that include but may not be limited to past, present, and future pain and suffering, permanent disability, impairment and disfigurement, past and future medical and medically related expenses, ability to perform household services and care for her minor children and husband, past lost earnings and future lost earning capacity, , loss of independence and enjoyment of life, loss of consortium  and other damages to be proven at trial.

57. Plaintiff Marvin Charley is Tammy Simpson's husband.  He has experienced damages resulting from Defendants' conduct and his wife's injuries that include but may not be limited to loss of spousal companionship / consortium, loss of household services and income support, and other damages to be proven at trial.

58. Tammy Simpson's next friends, minor child P.S. (age 14) and B.C. (age 7) have experienced damages resulting from Defendants' conduct and their mother's injuries that include but may not be limited to loss of their mother's guidance and counseling, loss of household services and income support, and other damages to be proven at trial.

## IV. CLAIMS FOR RELIEF

### COUNT I

### MEDICAL NEGLIGENCE AGAINST DEFENDANT THE UNITED STATES OF AMERICA

59. Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 58 as though fully recited herein.

60. At all times material hereto, the relationship of medical provider-patient existed between Tammy Simpson and the physicians and medical personnel who provided evaluations and care to her at the NNMC.

61. Pursuant to the Federal Tort Claims Act, Defendant United States of America is vicariously liable for the conduct of its employees acting within the scope of their duties, and is also vicariously liable for the conduct of any and all independent contractors, contractors, and actual, implied, apparent and ostensible agents of NNMC.

62. At all times pertinent hereto, and as to all acts alleged herein, all medical providers and personnel who provided care to Plaintiff Simpson acted within the scope of their duties, and with the full knowledge and consent of Defendant United States of America.

63. Defendant, acting through each of its agents and employees, owed Plaintiffs the duty to provide medical care of a nature and quality that was appropriate for a patient such as Tammy Simpson.

64. In treating and caring for Tammy Simpson, Defendant failed to exercise ordinary care and failed to possess and apply the knowledge, skill, and care of reasonably well qualified health care providers in similar areas of expertise, practicing under similar circumstances.

65. Defendant and its agents or employees breached the standard of care expected of them in caring for Plaintiff Simpson and were negligent in as the following ways, *inter alia*:

a. failing to properly evaluate Mrs. Simpson for a hypercoagulable blood condition from 2010-2016;

b. failing to diagnose and treat Mrs. Simpson with a hypercoagulable blood disorder requiring anti-coagulation therapy for life based on laboratory results in 2010;

c. failing to continue proper anti-coagulation therapy after her baby was born in 2011;

d. failing to properly treat thromboemboli in August, 2015;

e. failing to perform hypercoagulable workup as recommended after Mrs. Simpson's recurrent DVT and PE in August 2015;

f. failing to perform a hypercoagulability evaluation and treatment plan for Mrs. Simpson in May 2016 or to refer her to a qualified hematologist for same;

g. failing to refer Mrs. Simpson for evaluation to receive an IVC filter in May 2016;

h. stopping Mrs. Simpson's anti-coagulation therapy in May 2016;

i. prescribing anti-coagulation Lovenox on an "as needed" basis in May 2016;

j. graduating Mrs. Simpson from the Coumadin clinic in May 2016; and

k. failing to admit Mrs. Simpson for emergent therapeutic anticoagulation based on and clotting in her left arm and complaints of shortness of breath on September 14, 2016.

66. Plaintiffs allege that the foregoing acts of negligence were committed by Defendant's agents and employees acting in the course and scope of their patient care duties at or on behalf of NNMC, and that Defendant is vicariously liable for these acts of negligence.

67. As a result of Defendant's negligence, Tammy Simpson sustained a right middle cerebral artery (MCA) territory ischemic stroke and a multitude of subsequent injuries and damages flowing from that event.

68. As a result of Defendant's negligence, Plaintiff Tammy Simpson has sustained injuries and damages including but not limited to past, present, and future pain and suffering, permanent disability, impairment and disfigurement, past and future medical and medically related expenses, ability to perform household services and care for her minor children and husband, past

lost earnings and future lost earning capacity, loss of independence and enjoyment of life, loss of consortium and other damages to be proven at trial.

69. As a result of Defendant's negligence, Plaintiff Marvin Charley has sustained damages that include but may not be limited to loss of spousal companionship / consortium, loss of household services and income support, and other damages to be proven at trial.

70. As a result of Defendant's negligence, Tammy Simpson's next friends, minor child P.S. (age 14) and B.C. (age 7), have sustained damages that include, but may not be limited to, loss of their mother's guidance and counseling, loss of household services and income support, and other damages to be proven at trial.

## COUNT II

### MEDICAL NEGLIGENCE AGAINST STATE DEFENDANTS

71. Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 70 as though fully recited herein.

72. State Defendants owed Plaintiffs a duty to provide medical care of a nature and quality that was appropriate for a patient such as Tammy Simpson.

73. In treating and caring for Tammy Simpson, State Defendants failed to exercise ordinary care, and this failure proximately resulted in the injuries to Tammy Simpson.

74. State Defendant San Juan Oncology Associates P.C., acting through its agents, employees and principals Jeffrey Neidhart MD and/or James Neidhart MD, was negligent in failing to possess and apply the knowledge, skill, and care expected of a reasonably well qualified hematology clinic under similar circumstances, and Defendant San Juan Oncology Associates P.C. is vicariously liable for its agents' negligent conduct.

75. Alternatively, State Defendants James Neidhart MD and/or Jeffrey Neidhart MD were directly negligent in failing to possess and apply the knowledge, skill, and care expected of a reasonably well qualified hematologist under similar circumstances, and Defendants James Neidhart MD and/or Jeffrey Neidhart MD is and/or are directly liable for this negligent conduct.

76. San Juan Oncology Associates P.C., James Neidhart MD and Jeffrey Neidhart MD are referred to as the "Hematology State Defendants" hereinafter in this matter.

77. It was below the standard of care for the Hematology State Defendants to fail to provide appropriate consultation and advice to NNMC physician Sara Michaels MD about Mrs. Simpson's anti-coagulation risks and needs on or about April 21, 2016.

78. As a result of the negligent consultation by the Hematology State Defendants, Defendant NNMC stopped Plaintiff Tammy Simpson's daily anti-coagulation therapy and "graduated" her from its Coumadin Clinic on May 18, 2016.

79. The act of stopping Plaintiff Tammy Simpson's daily anti- coagulation therapy and "graduating" her from its Coumadin Clinic on May 18, 2016 was a cause of her inadequate anti-coagulation, development of clots and the right MCA territory ischemic stroke she had on September 17, 2016.

80. As a result of State Defendants' negligence, Plaintiff Tammy Simpson has sustained injuries and damages as set forth above, including but not limited to past, present, and future pain and suffering, permanent disability, impairment and disfigurement, past and future medical and medically related expenses, ability to perform household services and care for her minor children and husband, past lost earnings and future lost earning capacity, loss of independence and enjoyment of life, loss of consortium and other damages to be proven at trial.

81. As a result of the State Defendants' negligence, Plaintiff Marvin Charley has sustained damages that include but may not be limited to loss of spousal companionship/ consortium, loss of household services and income support, and other damages to be proven at trial.

82. As a result of the State Defendants' negligence, Tammy Simpson's next friends, minor child P.S. (age 14) and B.C. (age 7), have sustained damages that include but may not be limited to loss of their mother's guidance and counseling, loss of household services and income support, and other damages to be proven at trial.

## V. DEMAND FOR JURY TRIAL & PRAYER FOR RELIEF

Plaintiffs respectfully request a trial by jury on those issues so triable pursuant to Federal Rules of Civil Procedure, Rule 38.

WHEREFORE, Plaintiffs pray for an order of the Court entering judgment against the Defendants, and each of them jointly and severally, in an amount reasonable to compensate Plaintiffs for their damages, as follows:

1. For compensatory and consequential damages;
2. For pre and post judgment interest;
3. For punitive damages as may be allowed;
4. For attorney's fees and taxable costs as may be allowed; and
5. For other and further relief deemed warranted under the circumstances.

Respectfully submitted,

BARUDIN LAW FIRM, P.C.

*Electronically signed and filed 12/12 /18*
By:  Theodore W. Barudin
7900 Menaul Blvd NE
Albuquerque NM  87110-4606

(505) 332-1800
tbarudin@barudinlaw.com

And

Ronald I. Kaplan, MD, JD
KAPLAN & LUKOWSKI, LLP
333 Sandy Springs Circle, Suite 200
Atlanta, Georgia
Telephone: (404) 845-0012
rik@kaplanlegal.com

And

BENCOE & LACOUR, PC
Lori Bencoe
Cherie LaCour
9201 Montgomery Blvd. NE # 404
Albuquerque NM  87111
(505) 247-8800
lori@bencoelaw.com
cherie@bencoelaw.com

*Attorneys for Plaintiffs*