**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

TAMMY SIMPSON, Individually and
MARVIN CHARLEY, Individually, Husband and Wife,
and TAMMY SIMPSON, as Guardian and Next
Friend of P.S. and B.C., Minor children,

Plaintiffs,

   vs.         No. 1:18-cv-01169-KWR-LF

THE UNITED STATES OF AMERICA,

Defendant.

**PLAINTIFFS' FIRST MOTION FOR SUMMARY JUDGMENT
ON LIABILITY & CAUSATION: DEFENDANT USA'S FAILURE TO REFER TO
HEMATOLOGY SPECIALIST BREACHED THE STANDARD OF CARE
& WAS A CAUSE OF HARM**

  COME NOW Plaintiffs, by and through their attorneys of record and pursuant to Fed. R. Civ. P., Rule 56(c) and D.N.M.LR-Civ. 56.1, and prays for this Court's entry of an Order granting summary judgment and finding that as a matter of law, Defendant USA's failure to refer Plaintiff Tammy Simpson to a hematology specialist like Jeffrey Neidhart M.D. in 2016 was below the standard of care, and was a cause of harm to her.  As grounds for this Motion Plaintiffs state that there are no material facts in dispute on these matters and that the law entitles Plaintiffs to an Order granting summary judgment as a matter of law.

  **I.**  **INTRODUCTION**

  Plaintiffs, as husband and wife with two minor children, brought this Federal Tort Claims Act ("FTCA") against the U.S.A. to obtain compensation for damages caused by the negligence of agents of Northern Navajo Medical Center ("NNMC"), an Indian Health Services (I.H.S.) facility. The healthcare at issue was provided by NNMC primary care physician Sara Michaels MD to Plaintiff Tammy Simpson in 2016. Dr. Michaels had documented and managed Tammy

Simpson for hypercoagulable state through multiple thrombotic or "clot" events (including DVTs and PEs), since 2007. Despite her knowledge of that complex history, Dr. Michaels chose to stop Ms. Simpson's oral anticoagulation therapy in April 2016. She did so without first referring Ms. Simpson to a hematology specialist. Instead, she says she called a local hematologist, Jeffrey Neidhart MD, for informal telephone advice. Dr. Neidhart has no record of the call and does not remember it. But he flatly denies telling Dr. Michaels that stopping Ms. Simpson's anticoagulation therapy (Coumadin) was an acceptable option in light of her history of multiple prior clot events and diagnosis of hypercoagulable state in the past. It is his practice to place patients who have had multiple clot events on lifetime anticoagulation to prevent further clot events.

Tammy Simpson's hypercoagulable history was complex. Dr. Michaels undertook to manage it herself, and Plaintiffs contend she did so negligently. Dr. Michaels' failure to refer Ms. Simpson to a hematologist or to inform her that the complexity of her hypercoagulable history required a hematology expert, was negligent. As the undisputed facts in this Motion show, that failure resulted in harm: rather than remaining on her lifelong anticoagulation therapy as Dr. Neidhart would have required, Dr. Michaels permitted her patient the "option" of stopping her daily anticoagulant medicine. This was a cause of another clot event, a devastating stroke, just four months later. Ms. Simpson suffered a devastating ischemic stroke in September 2016 that resulted in permanent injuries and damages.

Depositions and discovery in this case have concluded, and the following undisputed facts and legal authorities support this Court's entry of an Order finding that Defendant USA's conduct constituted negligence as a matter of law and was a cause of harm as a matter of law. This is one of two Motions for Summary Judgment on liability and causation that Plaintiffs file

to address distinct breaches of the standard of care resulting in harm that are not materially disputed. This First Motion for Summary Judgment seeks a finding that it was negligent as a matter of law for Dr. Michaels, a family practice physician, not to refer Ms. Simpson to a hematology consultant. UJI 13-1103 NMRA 1987 (Duty to inform patient of need for another doctor). This motion also seeks a finding that that negligent omission was a cause of Ms. Simpson's stroke.[1]

## II.     UNDISPUTED MATERIAL FACTS

### A.     Medical History:

#### 1)   *first thrombotic event* -

1.     Tammy Simpson was diagnosed with her first pulmonary embolus on January 5, 2007. USA Response to Request for Admission (hereinafter "RRFA") No. 2 [Doc 89-1].

2.     It is undisputed that Sara Michaels M.D. was an employee and agent of Northern Navajo Medical Center ("NNMC") at all times when she provided care to Plaintiff Tammy Simpson. *See Civil Complaint and Answer.*

3.     Sara Michaels became Tammy Simpson's primary care doctor when she was admitted to NNMC with her first pulmonary embolus in 2007. *Exhibit 1, Michaels Depo Excerpts* at p. 29 lines 2-5.

4.     Dr. Michaels testified that Ms. Simpson's first pulmonary embolus was "potentially provoked" because she had broken her leg the previous September and had been immobile in a cast. *Exhibit 1*, p. 30 line 20 to p. 31 line 3.

---

[1]     Plaintiffs' other MSJ on liability and causation seeks a finding that it was negligent as a matter of law for Dr. Michaels to stop Ms. Simpson's oral anticoagulant therapy without first testing to rule out a hypercoagulable state called "protein C deficiency" in light of past laboratory results that could not be disregarded, and a finding that that conduct was a cause of Ms. Simpson's stroke.

*Plaintiffs' 1st MSJ on Liability & Causation: Defendant USA's failure to refer to hematology specialist breached the standard of care and was a cause of harm*

5.     Dr. Michaels put Ms. Simpson on Coumadin for six months after the first pulmonary embolus. *Exhibit 1*, p. 31 lines 14-16.

### 2)     2<u>nd</u> *thrombotic event, miscarriages & hypercoagulable testing:*-

6.     Tammy Simpson suffered a second pulmonary embolus in April, 2009. RRFA No. 3 [Doc 89-1].

7.     Dr. Michaels believed the second DVT/PE was caused by pregnancy. *Exhibit 1*, p. 32 lines 12-19.

8.     On April 21, 2009 a hypercoagulable laboratory test called Protein C Antigen was reported as low at 58% with the normal range 70-180. *Braunstein Affidavit, Exhibit 3 (4.21.2009 record).*

9.     On April 27, 2009, the NNMC Coumadin Clinic put Ms. Simpson on Coumadin for another six months. *Exhibit 1*, p. 38 lines 1-2; *Braunstein Affidavit, Exhibit 3 (4.27.2009 record).*

10.     The pharmacy referral note of April 27, 2009 stated that the indication for anticoagulation was "history of embolus, recurrent." *Id.*

11.     The pharmacy referral note of April 27, 2009 indicated that no hypercoagulable laboratory testing results had been obtained. *Id.*

12.     Before her deposition Dr. Michaels had never seen the record showing a low Protein C result on April 21, 2009. *Exhibit 1*, p. 33 lines 12-13, 21-15 and p. 34 lines 5-7.

13.     During the Coumadin Clinic treatment for Ms. Simpson's second DVT, the NNMC anticoagulation clinic asked Dr. Michaels to assess chest pain that could be another pulmonary embolus (PE). *Exhibit 1*, p. 39 lines 18-24.

14.	In January 2010, Dr. Michaels saw Ms. Simpson and noted "plan to check hypercoagulable labs" because "at this point she had had two events …and she wanted to become pregnant."  RRFA No. 7 [Doc 89-1]; *Exhibit 1*, p. 45 lines 20-23 and p. 46 lines 7-9, 16-20; *Braunstein Affidavit, Exhibit 3 (1.12.2010 record).*

15.	On November 10, 2010 an NNMC record states that Dr. Michaels ordered Lovenox 40 mg sq Qday as an anticoagulant for Ms. Simpson for "pregnancy, **hypercoagulable state**." *Braunstein Affidavit, Exhibit 3 (11.10.2010 record).*

16.	On November 14, 2010 hypercoagulable workup (laboratory tests) was ordered by Dr. Michaels for Tammy Simpson.  RRFA No. 10 [Doc 89-1].

17.	On November 18, 2010 the Protein C Antigen was reported low at 58% with the normal range 70-140.  RRFA No. 12 [Doc 89-1]; *Braunstein Affidavit, Exhibit 3 (11.14.2010 record).*

18.	On November 26, 2010 Ms. Simpson was seen in the NNMC ER for a spontaneous abortion or miscarriage. She was noted to have a medical history of "anticoagulation and pulm embolism."  Dr. Michaels signed the ER record. *Braunstein Affidavit, Exhibit 3 (11.26.2010 record).*

19.	On January 31, 2011 Dr. Michaels saw Ms. Simpson for complaints of left side face and arm numbness X 2 days and for a self reported spontaneous abortion (miscarriage) in early January.  *Braunstein Affidavit, Exhibit 3 (1.31.2011 record).*

20.	Dr. Michaels' January 31, 2011 note stated "LABS:  **Protein C was low, checked when pregnant**."  *Id*. But Dr. Michaels did not order a repeat Protein C test. *Id. and see Braunstein Affidavit, Exhibit 3 (02.01.2011 record).*

21.     On April 8, 2011 Dr. Michaels saw Ms. Simpson for a pregnancy test and re-started her on Lovenox 40mg sq Qday.  *Braunstein Affidavit, Exhibit 3 (04.08.2011 record).*

22.     On May 10, 2011 Dr. Michaels completed a NNMC Consultation Request Form for "high risk OB" consult/co-management of Ms. Simpson, "a 40 year old FEMALE, **Gravida 6 Para 2** EDD 11/22/11."  *Braunstein Affidavit, Exhibit 3 (05.10.2011 record.*

23.     Dr. Michaels' request for a high risk consultant said Ms. Simpson had history of "**thromboembolic disease**, hx PE x 2, last 4/2009 after Tab, completed Coumadin 2/2010 (about one year therapy). On prophylactic dose of Lovenox per rec of UNM. **Never got hypercoagulable labs while not pregnant or not treated**."  *Id*.

24.     On November 6, 2011 Tammy Simpson gave birth to her daughter and had a tubal ligation at San Juan Regional Medical Center ("SJRMC").  *Braunstein Affidavit, Exhibit 3 (11.06.2011 record).*

25.     At her first postpartum visit to NNMC on December 20, 2011 she was noted to be on "enoxaparin since her delivery because of hx hypercoagulable state and PE." *Braunstein Affidavit, Exhibit 3 (12.20.2011 record).*

26.     Dr. Michaels stopped the enoxaparin that day:  "can d/c enoxaparin. Discussed with dr michaels".  *Id*.

27.     Dr. Michaels did not order a repeat protein C test for Ms. Simpson.  *Id*.

28.     It is undisputed that after November 2010, Dr. Michaels **never** ordered another protein C test for Ms. Simpson.

29.     Dr. Michaels does not recall ever having a patient with protein C deficiency during her residency. *Exhibit 1*, p. 28 lines 9-10.

30.     Dr. Michaels testified she would order a protein C or protein S coagulation test "if someone had had recurrent clots, if they had a family history … a woman who had had multiple miscarriages, that would prompt ordering a hypercoagulable panel." *Exhibit 1*, p. 19 lines 9-16.

31.     It is undisputed that in 2012-2015, Dr. Michaels continued to be Ms. Simpson's primary care physician.

32.     From 2012 to August 8, 2015, Ms. Simpson was not on any continuous anticoagulant therapy.

*3)     third thrombotic event* -

33.     Tammy Simpson suffered her third DVT/PE in August 2015. RRFA No. 21 [Doc 89-1].

34.     On August 8, 2015 Ms. Simpson was diagnosed with a DVT of her right leg and was placed on Lovenox at SJRMC.  RRFA No. 19 [Doc 89-1].

35.     On August 10, 2015 Tammy Simpson was readmitted to SJRMC with multiple pulmonary emboli.  RRFA No. 20 [Doc 89-1].

36.     On August 11, 2015 Ms. Simpson had a peripheral vascular catheterization procedure and received an infusion of tPA by Dr. Sandhu at SJRMC to treat extensive clots in multiple veins in Ms. Simpson's upper leg (femoral).  *Braunstein Affidavit, Exhibit 3 (08.11.2015 record).*

37.     On August 11, 2015, Faraz Sandhu MD recommended life-long anticoagulant for Tammy Simpson.  RRFA No. 16 [Doc 89-1].

38.     Ms. Simpson was placed on Eliquis for six months after her August 10, 2015 admission at SJRMC.  RRFA No. 22 [Doc 89-1].

*Plaintiffs' 1st MSJ on Liability & Causation:  Defendant USA's failure to refer to hematology specialist breached the standard of care and was a cause of harm*

39.     Dr. Sandhu copied Dr. Michaels on his August 13, 2015 discharge summary that reported Ms. Simpson's diagnosis of both a DVT and PE, the catheterization and tPA procedures that she required, and the long term anticoagulation recommendation he made. *Braunstein Affidavit, Exhibit 3 (08.13.2015 record).*

40.     On September 10, 2015 Dr. Michaels noted Ms. Simpson would be switched from Eliquis back to Coumadin that the NNMC anticoagulation clinic would manage. *Braunstein Affidavit, Exhibit 3 (09.10.2015 record).*

41.     On November 4, 2015 the NNMC anticoagulation clinic noted that Ms. Simpson complained she had been having sharp chest pains that lasted less than a minute, multiple times per day, and said she has been short of breath for months, has not felt the same since her clot, and had pain and warmth in her right leg Saturday 10/31/15 said it remains swollen. *Braunstein Affidavit, Exhibit 3 (11.04.2015 record).*

42.     The November 4, 2016 note said the duration of Ms. Simpson's anticoagulation therapy was "Life/ Chronic/ Recurrent." *Id*.

43.     The clinic increased Ms. Simpson's weekly warfarin dose by 7% because her INR had been low the visit before as well as on November 4, 2015. *Id*.

44.     The November 4, 2015 note stated that Dr. Thoma had reviewed the chart and "thought that possible considerations should include Lovenox therapy in addition to Coumadin while pt is symptomatic or placement of an IVC filter." Dr. Michaels acknowledged receipt of this note on November 5, 2015. *Id.*

45.     Dr. Michaels noted in an Addendum on 11/9/2019 that she had received records of Ms. Simpson's November 6, 2015 visit to SJRMC and a CT angiogram that did not show a pulmonary embolism. *Id*.

*4) Dr. Michaels' choice to stop daily anticoagulation again* -

46.     On April 13, 2016 Ms. Simpson's anticoagulation clinic record still said "Duration of therapy:  Life/ Chronic/ Recurrent."  *Braunstein Affidavit, Exhibit 3 (04.13.2016 record).*

47.     The April 13, 2016 note said Ms. Simpson was taking warfarin for "deep venous thrombosis of lower extremity / recurrent, thrombectomy at SJRMC."  *Id.*

48.     The PLAN on April 13, 2016 was noted as:

```
PLAN:
1) No change in warfarin dose.
2) Follow up: RTC 2.5 weeks 29-APR-2016 on 10:40, will have INR drawn at lab 45
   minutes prior to appointment.
3) Dispense warfarin: WARFARIN 6MG TAB
         Sig: TAKE ONE (1) TABLET BY MOUTH EACH EVENING TO THIN BLOOD
4) TWD after visit:42mg
5) Discussed pt and plan with Dr. Michaels will schedule 1 more coumadin
   appointment, provider will talk to Dr. Neiderhart in hematology to discuss
   recommendation for life time warfarin verse IVF filters.
```

*Id.*

49.     Jeffrey Neidhart M.D. is a hematologist/ oncologist/ internist in Farmington. *Exhibit 4, Neidhart MLP Testimony Excerpts*, p. 47 lines 10-11.

50.     Dr. Neidhart takes calls from time to time from primary care providers with I.H.S. *Exhibit 4*, p. 48 lines 3-8.

51.     About once a week, Dr. Neidhart receives "curbside" calls for advice about patients with clot and anticoagulation issues that are not his.  *Exhibit 4*, p. 48 and p. 50 lines 6-9.

52.     Doctors from I.H.S., Northern Navajo and San Juan Regional call Dr. Neidhart on his cell phone about their patients. *Exhibit 4* p. 63-64.

53.     Dr. Neidhart does not make notes of such "curbside" calls about patients who are not his.  *Exhibit 4*, p. 48 lines 12-19.

54.     Dr. Neidhart **asks to see all** of these patients. *Exhibit 4* at p. 48, 50 and 64 lines 17-19 and 65 lines 11-12.

*Plaintiffs' 1st MSJ on Liability & Causation:  Defendant USA's failure to refer to hematology specialist breached the standard of care and was a cause of harm*

55.     Dr. Michaels does not dispute Dr. Neidhart's testimony that it's always his routine practice to ask to see patients when he's called for hematology consults. *Exhibit 1*, p. 95 at lines 8-11.

56.     Dr. Michaels testified she called Dr. Neidhart on his cell phone. *Exhibit 1* at p. 78 lines 19-20.

57.     Dr. Michaels admitted that she feels qualified to diagnose and treat patients with thrombophilia **in consultation with a hematology expert, potentially**. *Exhibit 1*, p. 28 lines 11-16.

58.     Dr. Michaels noted a conversation with Dr. Neidhart about Ms. Simpson on April 21, 2016, in an ADDENDUM to an NNMC anticoagulation clinic record:

```
04/21/2016 17:39     ADDENDUM          STATUS: COMPLETED
Spoke with Dr. Neidhart who recommended two options since pts DVT/PE have been
provoked and previous hypercoaguable eval was negative.
1) lifelong coumadin (given number of events)
2) aggressive prophylaxis when any risk of clot
Also to check b/e legs after treatment and check d-dimer
Also to check beta 2 glycoprotein if not checked in past
Discussed options with pt. She would like aggressive prophylaxis. She is driving
to California in early May, recommended staying on Coumadin until back from that
trip.
f/u appt scheduled with me 5/31/16 at 9:00
                    Signed by: /es/ SARA A MICHAELS MD
                                Family Medicine
                                04/21/2016 17:45
```

*Id.*

59.     Dr. Michaels testified she told Dr. Neidhart "…this patient had had three provoked events. She had side effects with taking Coumadin, did not like taking Coumadin … [and] hypercoagulable panel that had been negative in the past." *Exhibit 1* p. 79 lines 6-9.

60.     Dr. Michaels' 4/21/16 Addendum note does not contain the word "**or**". *Id.*

61.     But Dr. Michaels testified that during the phone call Dr. Neidhart told her "there was **two options** to discuss with the patient. **One was** lifelong Coumadin, and then **the other one** was aggressive prophylaxis if she had any sort of risk of clot, like planned surgery or

prolonged travel. And he also recommended repeating some studies, doing an ultrasound of her leg and doing additional lab work." *Exhibit 1* p. 80 lines 6-17 (emphasis added).

62.     Dr. Michaels explained, "[m]y recollection of the phone call was that there was two options, the lifelong Coumadin, just regular, you know, chronic anticoagulation **versus doing -- it was an or, not an and** doing prophylactic. You know, if there was a high-risk time, then you would anticoagulate. *Exhibit 1* p. 95 line 24 to p. 96 line 3 (emphasis added).

63.     Dr. Michaels admits that she provided incorrect information to Dr. Neidhart by telling him "that the hypercoagulability workup was negative but in fact it was not." RRFA No. 30 [Doc 89-1]; *Exhibit 1* p. 93 line 24 to p. 94 line 5.

64.     In deposition Dr. Michaels otherwise did not remember what Dr. Neidhart had asked her or what they had talked about specifically. *Exhibit 1*, p. 79 lines 10-17.

65.     Dr. Neidhart does not remember this phone call and did not make a note about it. *Exhibit 4*, p. 48.

66.     Dr. Neidhart and his practice, San Juan Oncology Associates ("SJOA"), were originally named as codefendants in this case. *Civil Complaint* [Doc. 1].

67.     After discovery, Dr. Neidhart and SJOA filed a Motion to Dismiss that stated "there is no evidence to establish a breach of a duty of care owed by Jeffrey Neidhart M.D. or SJOA and … there is no evidence that either Dr. Neidhart or SJOA were a cause of any harm claimed by Plaintiffs in this matter." [Doc. 60]. The USA approved/did not oppose this Motion. *Id*.

68.     Defendant USA stipulated to an Order that dismissed Dr. Neidhart and SJOA with prejudice. [Doc. 61].

*Plaintiffs' 1st MSJ on Liability & Causation:  Defendant USA's failure to refer to hematology specialist breached the standard of care and was a cause of harm*

69.     Before Dr. Neidhart was dismissed from this case, he testified at before the N.M. Medical Review Commission ("NMMRC") and in a deposition. *See Exhibit 4, Neidhart NMMRC testimony excerpts and Exhibit 5, Neidhart Deposition Excerpts.*

70.     After reviewing Ms. Simpson's records and the note Dr. Michaels wrote about the phone call with him, Dr. Neidhart testified that if a discussion with Dr. Michaels had occurred, he **absolutely** would have told Dr. Michaels, "I want to see this patient." *Exhibit 4* at p. 63 line 23 to p. 64 line 4; *Exhibit 5, ,* p. 25 line 22 to p. 26 line 4.

71.     **Any time** a patient has a second clot event, provoked or not provoked, Dr. Neidhart **always** advises lifelong anticoagulation. *Exhibit 4* at p. 50 line 24 to p. 51 line 7 and p. 67 lines 6-11.

72.     Dr. Neidhart would also recommend lifelong anticoagulants for a patient diagnosed with hypercoagulable state after their first clot event, because "the hypercoagulable state increases the risk of having another episode. They're already at least at 20 percent, probably 30 percent risk. And then the inherited protein C deficiency is basically putting it up there. So they're almost guaranteed to get another blood clot at some point in their life, especially for young people." *Exhibit 4* at p. 51 line 19 to p. 52 line 10.

73.     Dr. Neidhart would not ever recommend treating a patient with multiple DVT/PEs only with "aggressive prophylaxis when at any risk of clot" because alone that is a "bad option, I would never do it and it's not my recommendation." *Exhibit 5*, p. 26 lines 5-19.

74.     Dr. Neidhart would have told Dr. Michaels "lifelong anticoagulation" and "would not have recommended aggressive prophylaxis by itself." *Exhibit 5*, p. 26 lines 5-25.

75.     Dr. Neidhart said he would have recommended BOTH lifelong Coumadin and aggressive prophylaxis for Ms. Simpson. *Exhibit 4*, p. 58 lines 14-25.

*Plaintiffs' 1st MSJ on Liability & Causation:  Defendant USA's failure to refer to hematology specialist breached the standard of care and was a cause of harm*

76.     But on May 18, 2016, Dr. Michaels advised Brandon Anderson Pharm D, "pt. does not need to continue warfarin at this time.  Pt to receive prophylactic warfarin when traveling long distances or has high risk behavior for blood clots. Pt to follow up with provider on 5/31/2016 @ 0900."  RRFA No. 32 [Doc 89-1]; _Braunstein Affidavit, Exhibit 3 (05.18.2016 record)._

77.     NNMC graduated Ms. Simpson from its anticoagulation clinic that day:

ANTICOAGULATION DISMISSAL, graduated from clinic

_Id_.

### 5)  _harm that resulted after stopping daily anticoagulation --_

78.     Four months later, on September 14, 2016, Ms. Simpson was diagnosed with superficial left arm thrombophlebitis that Dr. Burnison properly treated.  RRFA No. 33, 36 [Doc 89-1].

79.     On September 14, 2016, Keith at the anti-coagulation clinic had a conversation with Dr. Burnison and advised that "I couldn't do a referral from the ED – it would have to come from Dr. Michaels. He rec warfarin 6mg po qd and Lovenox bid." RRFA Nos. 34-35 [Doc 89-1].

80.     Ms. Simpson does not remember the ER visit or Dr. Burnison, but she filled the prescriptions.  See _Exhibit 2, Excerpts to Tammy Simpson Depo, at pp. 180-183 and Ex. 5 to depo (photo of enoxaparin prescribed by Dr. Burnison on 09/14/16)._

81.     Ms. Simpson testified that if Dr. Burnison told her to take this medication she would have followed his instruction because "I followed the doctors."  _Id_ at p. 183 line 20 to p. 184 line 4.

82.     Tammy's husband Marvin Charley testified that the morning after the SJRMC ER diagnosed her with the superficial venous thrombus, she went to Shiprock (NNMC) and picked up her prescription for Lovenox and she followed the doctor's order to take it as far as he knows. *Exhibit 3, Marvin Charley Deposition Excerpts*, at p. 31 lines 6-10, 22-25, p. 32 lines 1-5, and p. 32 line 24 to p. 33 line 5.

83.     Marvin Charley testified that from 2007 on his wife was compliant about taking her medications and following her prescriptions. *Exhibit 3*, p. 19 lines 8-17 and p. 28 lines 9-14.

84.     On September 17, 2016 Tammy Simpson suffered a right middle cerebral artery territory infarction. RRFA No. 37 [Doc 89-1].

85.     SJRMC Neurologist Laura Waymire MD noted "Patient indicates that her primary care provider took her off of Coumadin approximately 1 month ago because her hypercoagulable workup was unremarkable." *Braunstein Affidavit, Exhibit 3 (09.18.2016 excerpted consultation record).*

86.     Dr. Waymire diagnosed the stroke as ischemic. *Id*.

87.     Dr. Waymire noted "I suspect in spite of her previously normal hypercoagulable workup but [that; sic] the patient does have some form of hypercoagulable state. She should be maintained on anticoagulation therapy indefinitely." *Id*.


**B.     EXPERT OPINION EVIDENCE:**

88.     Kenneth Braunstein M.D. is Plaintiffs' hematology standard of care expert; he has written two reports in this case. *Braunstein Affidavit and Exhibits 1-2 (Reports)*.

89.     It is Dr. Braunstein's opinion that the standard of care for a "reasonable physician" would be to "order a formal consultation with a hematologist to venture an opinion

regarding the length and type of future anticoagulation therapy that would be indicated."

Braunstein Affidavit and Exhibit 1 (first report); Exhibit 6 pp. 155-156.

90.    It is Dr. Braunstein's opinion that "[b]efore stopping the Coumadin, she should

have been seen by a competent hematologist … That is part of the answer of what should have

been done for her and that didn't happen." *Exhibit 6, Braunstein Depo Excerpts*, Vol. 2 p. 156 at

lines 4-8.

91. Dr. Braunstein testified,

> "If Dr. Michaels had Tammy Simpson's best interest at heart, recognizing Tammy
> Simpson's wishes, she should have sent her to a hematologist and said, make sure she
> does or does not have a hypercoagulation insult and then get her a therapy she will
> accept, to keep her from getting clots. She is a family practitioner. This is above her pay
> grade."

*Id.* at p. 155 lines 13-20.

92.    Dr. Braunstein was critical of the conversation Michaels claims to have had with

Dr. Neidhart that he denied:  "You know the term garbage in, garbage out. You call a doctor that

doesn't have the records and you get an opinion from him, you've got garbage in and garbage

out. He has to know exactly what's going on with the patient." *Exhibit 6* p. 156 lines 13-20.

93.    Defendant USA's hematology standard of care expert Jose Avitia MD admits that

a doctor providing consultation information has the duty to provide the correct information.

*Exhibit 7*, Jose Avitia MD Deposition Excerpts, at p. 85 lines 16-19.

94.    Dr. Avitia testified that the standard of care or "job of the physician is to always

ask for a formal consultation so that they can be assured they're receiving all of the information."

*Exhibit 7* at p. 85 line 20 to p. 86 line 2.

95.    Dr. Avitia admits that a patient with a hypercoagulable disorder is at increased

risk for DVT and PE. *Exhibit 7* at p. 72.

96.     Dr. Avitia admits that the biggest risk of having a pulmonary embolism is death. *Exhibit 7* at p. 72.

97.     Dr. Braunstein's opinion that testified that it is more likely than not if Ms. Simpson had been fully anticoagulated as of September 14, to a reasonable degree of medical probability she would not have suffered the stroke.  *Exhibit 6* at p. 227 line 24 to p. 228 line 4; *and see Braunstein Affidavit and Ex. 1 (1ˢᵗ Report).*

## III.     LEGAL ARGUMENT & AUTHORITIES

### A.     STANDARD OF REVIEW

 A party may move for summary judgment on any claim or defense or on any part of any claim or defense.  Fed. R. Civ. P. Rule 56(a), (c) and D.N.M.LR-Civ. 56.1.  The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P., Rule 56(a). The court should state on the record the reasons for granting or denying the motion.  *Id.*

On motion for summary judgment, The Court is to "view[s] all evidence and any reasonable inferences that might be drawn therefrom in the light most favorable to the non-moving party." *Riser v. QEP Energy,* 776 F.3d 1191, 1195 (10th Cir. 2015) *(*quoting *Croy v. Cobe Labs. Inc.,* 345 F.3d 1199, 1201 (10th Cir. 2003)*).* A "material" fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)*.* "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *E.E.O.C. v. Horizon/CMS Healthcare Corp.,* 220 F.3d 1184, 1190 (10th Cir. 2000)*.*

The court may consider admissions and facts conclusively established. *U.S. v. Farmers Mut. Ins. Ass'n of Kiron, Iowa,* 288 F.2d 560 (8th Cir. 1961).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial". *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir. 1990); see *Guest v. Berardinelli,* 2008-NMCA-144, ¶¶ 6-7, 145 N.M. 186, 195 P.3d 353 (burden on nonmovant is to present admissible evidence that establishes a reasonable doubt, rather than a slight doubt). Entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which it will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 47 U.S. 317, 322, L. Ed. 2d 265 (1986).

B.   **APPLICABLE LAW FOR MEETING BURDEN OF PROOF ON EACH ELEMENT OF A MEDICAL NEGLIGENCE CLAIM**

This Federal Tort Claims Act ("FTCA") action seeking damages from the USA for medical negligence is subject to the laws that would apply if Plaintiffs were suing a private person in New Mexico under similar circumstances. 28 U.S.C. §§1346(b)(1) and 2671. Thus, there is no dispute that New Mexico's Medical Malpractice Act, §§41-5-1 NMSA 1978 *et seq*., Supreme Court jury instructions and common laws inform the substantive law that applies in this medical malpractice case. Id.; *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 426-27 (1996); *Peña v. Greffet*, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015) (Browning, J.) (to determine applicable state law, court first considers any decision from the state's highest court that governs that particular area of substantive law). The New Mexico Supreme Court speaks both through written opinions and through Uniform Jury Instructions, which the court approves before they can be published.

"A party seeking a recovery or relying on a defense has the burden of proving every essential element of the claim or defense by the greater weight of the evidence. To prove by the greater weight of the evidence means to establish that something is more likely true than not true. Evenly balanced evidence is not sufficient." UJI Civ. 13-304 NMRA. The burden requires proof through evidence /testimony that the matter is "**more likely than not with a reasonable medical probability, not mere possibility**." *State v. Consaul*, 2014-NMSC-030, ¶69, 332 P.3d 850 (emphasis added). In order to be admissible and probative, expert testimony about an element of a claim or defense in a medical malpractice case must meet this standard. Possibilities are insufficient.

Plaintiffs' burden as movant for summary judgment in a medical malpractice case is to make a prima facie case of entitlement to summary judgment on any element of the claim: (1) the defendant owed the plaintiff a duty recognized by law; and/or (2) the defendant breached the duty by departing from the proper standard of medical practice recognized in the community; and/or (3) the acts or omissions complained of [proximately] caused the plaintiff's injuries. *Blauwkamp v. Univ. of N.M. Hosp.,*1992-NMCA-048, 114 N.M. 228, 231, 836 P.2d 1249, 1252, citing SCRA 1986 13-1101 (now revised as UJI Civ. 13-1101 NMRA 2016) (with citations indicating removal of "proximately" per UJI Civ. 13-305 NMRA 2016). *See* also, *Romero v. Phillip Morris Inc.*, 2010-NMSC-035, ¶ 10, 148 N.M. at 721 and *State ex. Rel. Children Youth & Families v. Joe R.*, 1997-NMSC-038 ¶ 15, 123 NM 711 (moving party required to make prima facie showing of entitlement to summary judgment by showing no genuine issues are disputed).[2]

---

[2]   A defendant has the same burden of proof to support affirmative defenses; when there is no triable issue of fact as to an affirmative defense, it is ripe for summary judgment adjudication. *Fidelity Nat'l Bank v. Tommy L. Goff, Inc.,* 92 N.M. 106, 583 P.2d 470 (1978); *Jaramillo v. Kellogg*, 1998-NMCA-142,125 N.M. 84.

In medical negligence cases such as this one, elements of claims and affirmative defenses are required to be established by expert testimony. *Jaramillo v. Kellogg,* 1998-NMCA-142, 126 N.M. 84. *Lopez v. Southwest Comm'y Health Servs.*, 1992-NMCA-040, 114 N.M. 2, 833 P.2d 1183, 1188; *Baer v. Regents of Univ. of California*, 1999-NMCA-005, 126 N.M. 508, 510, *Goffe v. Pharmaseal Labs, Inc.,*1976-NMCA-123 ¶¶ 5-6, 90 N.M. 764, 568 P2d. 600; *Tafoya v Seay Brothers Corp.,* 1995-NMSC-003, ¶ 8, 119 NM 350, 352, 890 P.2d 803, 805 ("the party alleging the affirmative defense has the burden of persuasion"). Further, expert testimony is generally required to establish causation. *Id.*

Years ago, our Supreme Court held that the "administration of medicine" was a field of knowledge in which only an expert could give a competent opinion. *Woods v. Brumlop*, 1962-NMSC-133, 71 NM 221, 377 P.2d 520, 522. The more recent cases support and affirm this conclusion and establish that in New Mexico, a medical expert's testimony is generally essential on the standard of care, breach and causation in medical malpractice cases such as this one. *Lopez v. Southwest Community Health Servs* at ¶ 13, 114 N.M. at 7, 833 P.2d at 1188; see also *Blauwkamp; Toppino v. Herhahn*, 1983-NMSC-079, 100 NM 564, 673 P.2d 1297; *Pharmaseal Labs, Inc. v. Goffe,* 1977-NMSC-071, 90 N.M. 753, 568 P.2d 589, *aff'd in part rev'd in part*, 1976-NMCA-123, 90 N.M. 764, 568 P2d. 600.

## 1) duty to act within the standard of care and breach:

The New Mexico Supreme Court has issued a jury instruction articulating the burden of proving duty and breach of the "standard of care" owed by a physician. UJI 13-1101 NMRA 1998 (duty of doctor). It also codifies the common law definition of "standard of care" and principle that expert testimony is required to prove whether or not the defendant physician "standard of care" was met:

In treating and caring for a patient, doctor Sara Michaels M.D. is under the duty to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified primary care doctors practicing under similar circumstances, giving due consideration to the locality involved. A primary care doctor who fails to do so is negligent.

The only way in which you may decide whether the doctor in this case possessed and applied the knowledge and used the skill and care which the law required of her is from evidence presented in this trial by doctors testifying as expert witnesses. In deciding this question, you must not use any personal knowledge….

*Id. (modified).* Expert testimony on the standard of care that a physician owed a patient can be offered by doctors from the same or other localities. *Pharmaseal v. Goffe.*

It is undisputed that Defendant USA's employed physician Sara Michaels MD is a family practice physician who chose to manage Plaintiff's hematology condition. As such, she should be held to the standard of care for a hematologist practicing under similar circumstances, consistent with UJI 13-1102 NMRA 1998 (duty of specialist). This instruction would be appropriate for the finder of fact at trial:

Sara Michaels M.D., who held herself out as a specialist in hematology, having undertaken to treat and care for a patient in this specialized field, is under the duty to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified specialists practicing under similar circumstances, giving due consideration to the locality involved. A doctor who fails to do so is negligent.

The degree of knowledge, skill, and care required of a specialist is usually higher than that required of a non-specialist, but it is never lower. Specialists are responsible for a certain base of knowledge in common with general practitioners, as well as additional knowledge in the field of their specialty.

The only way in which you may decide whether the doctor in this case possessed and applied the knowledge and used the skill and care which the law required of her is from evidence presented in this trial by doctors testifying as expert witnesses. In deciding this question, you must not use any personal knowledge ….

*Id.* (modified). The parties both have hematology experts to offer testimony as evidence on the question of whether or not Dr. Michaels breached the standard of care she owed when she was

managing Ms. Simpson's hematology condition, and on the question of whether or not any breach of the hematology standard of care was a cause of harm to Ms. Simpson as Plaintiffs contend it was. As this and other Motions filed on this topic show, Plaintiffs contend that Defendant Michaels breached the hematology standard of care in a number of ways.

### 2) <u>duty to inform the patient of need for another doctor:</u>

Uniform Jury Instruction 13-1103 NMRA 1987 provides that:

If a treating doctor knows, or should know, that a doctor with other qualifications is needed for the patient to receive proper treatment, it is the duty of the treating doctor to tell the patient.

*Id.* The New Mexico Supreme Court's use note for this instruction states:

**USE NOTES**

**This instruction should be given in conjunction with either UJI 13-1101 or 13-1102 NMRA when evidence is presented in support of plaintiff's claim of negligent failure to refer the patient to another health care provider.**

**[As amended, effective January 1, 1987.]**

This is thus one of the instructions for determining one type of conduct that can constitute a breach of the standard of care in a case. Plaintiffs contend Dr. Michaels failed to fulfill her duty to Plaintiff Tammy Simpson in this way.

### 3) <u>causation of harm</u>:

The second element of every medical malpractice tort claim is causation. In every case in which an act, omission or condition is said to have caused injury or harm, the New Mexico Supreme Court instructs that the following jury instruction applies for the finder of fact:

An act or omission is a "cause" of injury if[3] it contributes to bringing about the injury, and if injury would not have occurred without it. It need not be the only

---

[3]     The phrase "unbroken by an independent intervening cause" is omitted from the form instruction because Defendant USA did not assert that affirmative defense in this case. See Answer to Civil Complaint [Doc 14]. The comments to UJI 13-305 NMRA state that this phrase is not appropriate when a defendant is merely arguing lack of causation. Sup. Ct. Order No. 11-8300-003, effective March 21, 2011.

*Plaintiffs' 1st MSJ on Liability & Causation:  Defendant USA's failure to refer to hematology specialist breached the standard of care and was a cause of harm*

explanation for the injury, nor the reason that is nearest in time or place. It is sufficient if it occurs in combination with some other cause to produce the result. To be a "cause", the act or omission, nonetheless, must be reasonably connected as a significant link to the injury.

UJI 13-305 NMRA 2011.


**C.** **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON LIABILITY BECAUSE THERE IS NO DISPUTE THAT DR. MICHAELS/ USA BREACHED ITS DUTY TO INFORM MS. SIMPSON OF THE NEED FOR ANOTHER DOCTOR (a hematologist)**

Plaintiffs are entitled to summary judgment on this element of their claim because the facts and opinions of the parties' experts establish without dispute that Dr. Michaels knew or should have known that the qualifications of a hematology specialist were needed to properly manage Ms. Simpson's hematology care, yet she did not inform Ms. Simpson of this. UJI 13-1103 NMRA. The USA cannot present facts to create a genuine issue of material fact on this claim.

It is undisputed that Dr. Michaels never informed told Ms. Simpson that she needed to see a hematology specialist to receive proper treatment. It is undisputed that Dr. Michaels could have requested a formal hematology consultation for Ms. Simpson before stopping her daily anticoagulant therapy in 2016. She had referred Ms. Simpson to a "high risk OB" in 2009 to manage her pregnancy because of her history of clot events that included four miscarriages/lost pregnancies in the past (gravida 6 para 2), thromboembolic disease, two previous pulmonary emboli, and because she "never got hypercoagulable labs while not pregnant or not treated." UMF 22, 23. Dr. Michaels had access to Dr. Neidhart via his personal cell phone. UMF 52, 56. He had an established practice of taking such "curbside calls from doctors in the community, always asked to see their patients, and says he "absolutely" would have asked to see Ms.

Simpson if Dr. Michaels had called him about her. UMF 50-55, 70. Dr. Michaels admits she has no reason to dispute that, and her memory of the call with Dr. Neidhart was limited to what her note said about it. UMF 55, 64. Regardless of the reason for this omission, it was negligent.

It is also not disputed that Dr. Michaels knew she needed a hematology consultation in 2016 in order to provide proper treatment to Ms. Simpson. She admitted she felt qualified to diagnose and treat patients with thrombophilia "***in consultation with experts, potentially***." UMF 57. The anticoagulation clinic clearly noted that Dr. Michaels' plan April 13, 2016 was to "talk to Dr. Neiderhart [sic] in hematology to discuss recommendation for life time warfarin verse IVC filters." UMF 48. There is no evidence that consultation about that treatment choice (warfarin or IVC filter) ever took place. Dr. Michaels should have known that the decision whether to recommend life time warfarin or an IVC filter was of great consequence, because of Ms. Simpson's complex, nine-year history of multiple miscarriages (UMF 18, 22-23), three previous DVTs with pulmonary emboli (UMF 1, 3-5, 6-7, 33-36), one thrombectomy and tPA infusion for extensive right upper extremity clots (UMF 36), and a question about hypercoagulable state that had been pending since at least January 31, 2011 when Dr. Michaels had noted "Protein C was low, checked when pregnant." (UMF 20; see also UMF 14). Dr. Michaels was not medically trained in the management of Protein C deficiency hypercoagulable state as she did not recall having a patient with Protein C deficiency during her residency. UMF 29.

Dr. Michaels' attempt to get informal hematology advice in a "curbside" cell call to Dr. Neidhart fell short of the standard of care she owed Ms. Simpson. First, by Dr. Michaels' own admission she misrepresented her patient's "hypercoagulable panel had been negative in the past" when that was not true. UMF 59, 63. Second, though Dr. Neidhart does not remember this

call and made no note of it, he testified emphatically that it is his practice to ask to see patients when he's called for hematology consults. UMF 55, 65. It was below the standard of care for Dr. Michaels not to relay Dr. Neidhart's name and his request to her patient. Third, the parties' standard of care experts in this case agree that the standard of care required Dr. Michaels to do what Dr. Neidhart requested and send Ms. Simpson to him for a formal hematology consultation. UMF 90-94. Dr. Braunstein and Dr. Avitia both testified that the duty to have the patient formally consult the specialist is important to assure that they receive all of the correct information, so the specialist can know exactly what is going on with the patient. *Id*. Without records and a history and physical, Dr. Neidhart's advice to Dr. Michaels was only as reliable as what she told him on the phone and documented in her chart after the fact.

The substandard "curbside" phone call with Dr. Neidhart clearly resulted in confusion that led Dr. Michaels to implement a treatment plan for Ms. Simpson that Dr. Neidhart would never have recommended. It is undisputed that Dr. Michaels misunderstood Dr. Neidhart's two-part recommendation for protecting Ms. Simpson from further clot events in light of her history as an "either/or" plan that would permit a patient choice.[4] UMF 61-62, 71-75. Dr. Neidhart testified he would never treat a patient with multiple clot events ONLY with "aggressive prophylaxis when at any risk of clot," called it a "bad option" and said "I would never do it and it's not my recommendation." UMF 73. When Dr. Michaels offered Ms. Simpson the choice of stopping her daily anticoagulant in favor of "aggressive prophylaxis during high risk events" contrary to Dr. Neidhart's recommendation, that was negligent. Dr. Michaels should have formally involved Dr. Neidhart as one of Tammy Simpson's doctors, as she had done with Ms.

---

[4] Plaintiffs contend it was below the standard of care for Dr. Michaels to offer Tammy Simpson the option of stopping daily anticoagulants in favor of "aggressive prophylaxis" during high risk events, period. Because the experts disagree, there are facts in dispute on that claim. But that dispute is not germane to this Motion.

*Plaintiffs' 1st MSJ on Liability & Causation: Defendant USA's failure to refer to hematology specialist breached the standard of care and was a cause of harm*

Simpson's high risk OB in 2011, and as Dr. Neidhart told her to. It is a tragedy that Ms.

Simpson was never informed about Dr. Neidhart.

**D.** **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON CAUSATION BECAUSE THERE IS NO DISPUTE THAT IF DR. MICHAELS/ USA HAD INFORMED MS. SIMPSON OF THE NEED FOR A HEMATOLOGY CONSULTATION, HE WOULD HAVE KEPT HER ON LIFELONG ANTICOAGULATION**

For the purpose of this Motion, the Court does not need to address whether or not Dr.

Michaels' conduct in offering Ms. Simpson a choice to stop anticoagulant in May 2016 met or

breached the standard of care. *See footnote 4, supra.* Instead, if the finder of fact concludes that

Dr. Michaels breached the standard of care by failing to inform Ms. Simpson of the need for a

hematology consultation, the causation question is whether or not that failure was a cause of

harm. Plaintiffs contend that it absolutely was. If Dr. Michaels had sent Ms. Simpson for a

hematology consultation with Dr. Neidhart in 2016 before stopping her anticoagulant Coumadin,

there is no dispute what he would have done. After reviewing the medical records he first saw in

the context of this legal action, Dr. Neidhart would have recommended lifelong anticoagulants

AND aggressive prophylaxis for Ms. Simpson. UMF 70-75. He would NOT have given her a

choice to stop taking an oral anticoagulant.

Dr. Neidhart's testimony about what he would have done is based on his custom and

practice of providing hematology management of patients with thromboembolic diseases like

Ms. Simpson's. It is his practice to advise any patient who has had more than one clot event,

provoked or not, to remain on lifelong anticoagulation. UMF 71. He would manage the same

for a patient with one clot and a hypercoagulable state diagnosis. UMF 72. It was his belief that

this was necessary because patients with these risks, especially young people, have a significant

(20-30 percent) risk of a recurrent clot after a first clot event. UMF 73. It is Dr. Braunstein's

opinion that if Ms. Simpson had remained on oral anticoagulants, she would not have suffered an ischemic stroke in September 26. UMF 97. Stopping coumadin was more likely than not a cause of the stroke. *Id*. The other possible causes Defendant's experts offer for a stroke like Ms. Simpson had are not a basis to deny summary judgment on causation. UJI 13-305 (negligence only needs to be A cause; not THE cause).

WHEREFORE, Plaintiffs pray for this Court's entry of an Order finding that as a matter of law, Defendant USA's failure to refer Plaintiff for a hematology consultation in 2016 was negligent and was a cause of harm to her.

Respectfully submitted,

BENCOE & LACOUR LAW, PC

By */s/ Lori M.Bencoe*
    LORI M. BENCOE
    CHERIE L. LACOUR
    Attorneys for Plaintiffs
    9201 Montgomery Blvd., NE, Suite 404
    Albuquerque, NM 87111
    Phone: (505) 247-8800
    Email: Lori@bencoelaw.com
    Cherie@bencoelaw.com
    *Attorneys for Plaintiffs*

    Ted Barudin
    BARUDIN LAW FIRM, PC
    Attorneys for Plaintiffs
    7900 Menaul Blvd., NE
    Albuquerque, NM 87110-4606
    Phone: (505) 332-1800
    Email: tbarudin@barudinlaw.com
    *Co-counsel for Plaintiffs*

    Ronald I. Kaplan, MD, JD
    Kaplan & Lukowski, LLP
    Attorneys for Plaintiffs
    333 Sandy Springs Circle, Suite 200
    Atlanta, GA
    Phone: (404) 845-0012

Email: rik@kaplanlegal.com
*Co-counsel for Plaintiffs*

## <u>CERTIFICATION OF FILING</u>

This is to certify that on September 22, 2020, Plaintiffs filed this *Motion For Summary Judgment* via CM/ECF and served it via electronic filing to:

Roberto D. Ortega
United States Attorney's Office
District of New Mexico
P.O. Box 607
Albuquerque, NM
87103 (505) 346-7282

*/S/ Lori M. Bencoe*
Lori M. Bencoe